Filed 6/26/15  P. v. Garcia CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANUEL GARCIA,<br><br>    Defendant and Appellant. | B255566<br>(Los Angeles County<br>Super. Ct. No.  LA071103) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Jesic, Judge.  Affirmed as modified, remanded with directions.

    Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

    Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Manuel Garcia challenges his conviction for murder on the grounds of instructional error, juror misconduct, and improper denial of access to juror identification information. We reject his challenges to the judgment, with the exception of his contention that the trial court miscalculated his presentence custody credits; in addition, we conclude that the sentencing hearing minute order contains an error. Accordingly, we modify the judgment to reflect appellant's presentence custody credits, direct the trial court to correct the minute order, and affirm the judgment so modified.

**RELEVANT PROCEDURAL BACKGROUND**

On February 13, 2014, an amended information was filed charging appellant in count 1 with the murder of Jorge Hortencio Valladares (Pen. Code, § 187, subd. (a)), in count 2 with corporal injury to a cohabitant, namely, Perla G. (Pen. Code, § 273.5. subd. (a)), and in count 3 with the attempted murder of Jesus Antonio Diaz (Pen. Code, §§ 187, subd. (a), 664).[1] Accompanying counts 1 and 3 were allegations that appellant personally used a knife and/or pot in the commission of the offense (§ 12022, subd. (b)(1)).

During trial, after the prosecution completed its case in chief, the court dismissed count 2 (§ 1118.1). A jury found appellant guilty as charged in count 1 and found true special allegations that he used a knife and a pot in the commission of the offense (§ 12022, subd. (b)(1)). The jury acquitted appellant of the offense charged in count 3. The trial court sentenced appellant to a total term of 25 years to life plus one year. This appeal followed.

---

[1] All further statutory citations are to the Penal Code.

2

## FACTS

A. *Prosecution Evidence*

In June 2012, appellant lived in an apartment with his girlfriend, Perla G. Also residing in the apartment were Jorge Hortencio Valladares and Jesus Antonio Diaz.[2] Appellant and Perla shared a bedroom, and Valladares and Diaz slept in the living room. Appellant was 21 years old, weighed 150 lbs, and was 5 feet 5 inches tall. Valladares was 67 years old, weighed 92 lbs, and was five feet tall.

Diaz testified that on the evening of June 1, 2012, he bought some beer and brought to it to the apartment, where appellant, Valladares, and Perla were present. The men played cards and drank beer. During the card games, Valladares used a knife to cut lemons for the beer. At approximately 11:00 p.m., Diaz and Valladares retired to their beds, and appellant went into the bedroom. Sometime later, Diaz heard appellant and Perla arguing in the bedroom. After threatening to hit Perla, appellant left the bedroom. When Valladares told appellant not to hit her, appellant threw bottles and a DVD player at him. The two men then began to fight. According to Diaz, Valladares had no weapon. Diaz tried to calm appellant, who returned to the bedroom. Diaz concluded that the incident had ended, and left the apartment to smoke a cigarette.

Diaz further testified that while he stood outside the apartment, Perla ran out and screamed that appellant was killing Valladares. Diaz tried to open the apartment's screen door, but discovered that it was locked. When Diaz demanded to be allowed into the apartment, appellant said, "I am going to kill him." Through the screen door, Diaz saw appellant in the kitchen making striking motions with a

---

[2]     Melvin Linares, the apartment's fifth resident, was not in the apartment during the pertinent events.

pan, but could not see what appellant was hitting because some furniture blocked his view. Diaz ran for help and encountered a passerby, who called 911.[3]

Diaz further testified that while the 911 call was being made, he saw appellant leave the apartment. Appellant held the knife Valladares had used to cut lemons, and was covered with blood. Appellant ran toward Diaz, declaring that he "[was] next." As Diaz fled, he told Perla, who was nearby, to run. After chasing Diaz unsuccessfully for half a block, appellant began to run after Perla as police officers arrived at the scene.[4]

In the apartment's kitchen, police officers found Valladares, who died despite attempts to resuscitate him. Valladares's body was "'bleeding out,'" and there were significant amounts of blood on the kitchen's counters and floor. Also present in the kitchen was a bent pot or pan. A trail of blood outside the apartment led officers to the knife Valladares had used to cut lemons, which was located approximately one-quarter of a mile from the apartment. At 1:30 p.m. on June 2, 2012, when appellant was arrested, he had some scratches on his neck and torso.

Ajay Panchal, a medical examiner, performed an autopsy on Valladares's body. Valladares had suffered two dozen lacerations on his head, along with a broken nose, jaw, ribs and skull, which Panchal attributed to blows from a blunt object. Valladares also had over 30 "sharp force" injuries, 14 of which were fatal. He had stab wounds to the liver, lung, spleen, and aorta, some as deep as four inches. Panchal opined that Valladares died of a combination of sharp force injuries that cut his carotid artery and blunt force injuries that fractured his skull.

---

[3] An audio recording of the 911 call was played for the jury.

[4] The prosecution also called Maria Gonzalez as a witness. Gonzalez, who lived near appellant, testified that at approximately 2:00 a.m. on June 2, 2012, she heard screams for help and saw a young man chasing a young woman outside her residence.

B. *Defense Evidence*

Appellant's sole witness was Perla, who testified that in June 2012, she was 17 years old and pregnant with appellant's child.[5]  During the evening of June 1, 2012, appellant arrived at the apartment from work.  At approximately 9:00 p.m., Perla and appellant went to buy beer at a nearby store, where they encountered Diaz.  Because the store employees refused to sell beer to appellant, Diaz bought it.  After returning to the apartment, appellant and Perla listened to music in their bedroom, and Diaz socialized with Valladares in the kitchen.  All the men were drinking beer.  According to Perla, appellant drank six bottles of beer in approximately 15 minutes while he was in the bedroom, and appeared to be drunk.

Between 9:00 and 10:00 p.m., at Valladares's request, appellant left the bedroom to play cards with Valladares and Diaz in the kitchen.  Appellant repeatedly returned to the bedroom to obtain gambling funds from Perla, who eventually gave him more than $200.  At some point, Diaz stopped playing cards and went to his bed to sleep.

At approximately 1:30 a.m., appellant asked Perla for more gambling funds.  When she said she had no more money, they began arguing.  Appellant threw a remote control device at Perla, which she threw back at him.  After he grabbed her by her necklace, she bit his hand.  Appellant bit Perla's knee, placed himself on top of her on the bed, and tried to reach for a nearby lamp.  As they struggled, appellant grabbed her shirt and tore it.  Perla became frightened and fled to a nearby bathroom.

---

[5]     Because Perla was unavailable as a witness at the time of the trial, appellant presented a video recording of her conditional examination conducted in September 2012.

While in the bathroom, Perla heard Valladares say, "What did you do to her?" and "What did you say to her?," immediately followed by the sound of the kitchen's water cooler falling. Upon leaving the bathroom, she saw appellant and Valladares in the kitchen. Appellant was struggling with Valladares, who grappled with appellant and held a knife directed at appellant's back. Appellant was pushing Valladares away with his hands. According to Perla, Valladares said, "You didn't expect this." Perla fled back to the bathroom.

Perla left and returned to the bathroom two more times. The first time she left she saw Diaz standing nearby with his hand on appellant's face, apparently preparing to hit appellant with his other hand, which was a closed fist. Valladares was nearby, holding the knife. Because Diaz looked at her, she decided to return to the bathroom. When Perla next left the bathroom, appellant and Valladares were struggling with each other on the kitchen floor, but Diaz was not in sight. Appellant was atop Valladares. Perla did not see who had the knife. When appellant asked Perla to help him, Valladares said, "No."

Perla became frightened and decided to leave the apartment. Outside she encountered Diaz, who blamed her for the incident, and said that he intended to call the police. Through the metal screen door, she asked appellant "not to do anything," but he ignored her. She saw appellant hitting something with a frying pan, but could not see whether his target was Valladares because a stove blocked her view. According to Perla, appellant was looking down as he wielded the pan. Perla soon saw appellant leave the apartment. He was holding the knife and was covered with blood. When he began to run toward her, she fled and hid.

## DISCUSSION

Appellant contends the trial court erred in instructing the jury, denying his motion for a mistrial predicated on juror misconduct, and rejecting his request for

6

information regarding the jurors involved in the alleged misconduct. Additionally, appellant asserts that the minute order from the sentencing hearing contains an error, and that the trial court miscalculated his presentence custody. For the reasons discussed below, we conclude that appellant has shown no reversible error.

A. *Voluntary Intoxication Instruction*

Appellant contends the trial court committed reversible error by giving an incorrect instruction on voluntary intoxication. The court instructed the jury with CALCRIM No. 3426, which stated in pertinent part: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to kill." Appellant argues that the instruction improperly barred the jury from considering the evidence of intoxication in determining whether appellant, in killing Valladares, acted with other aspects of the mental state required for first degree murder, namely, deliberation and premeditation. As explained below, although the instruction was erroneous, the record discloses no prejudice.[6]

---

[6]     Relying on the doctrine of invited error, respondent asserts that appellant has forfeited his contention. We disagree. The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error intentionally induced by defense counsel. (*People v. Marshall* (1990) 50 Cal.3d 907, 931.) It is ordinarily inapplicable when the trial court errs in discharging its duties to provide correct instructions, and the defense counsel acquiesces in the error through mistake or negligence. (*People v. Graham* (1969) 71 Cal.2d 303, 319, disapproved on another ground in *People v. Ray* (1975) 14 Cal.3d 20, 29.) As explained below, the court was obliged to provide a correct instruction under the circumstances present here, and nothing before us suggests that defense counsel affirmatively sought the incorrect instruction. Accordingly, there was no invited error.

7

When a defendant is charged with murder, evidence of voluntary intoxication is admissible regarding the defendant's intent to kill and the existence of deliberation and premeditation.[7] (*People v. Castillo* (1997) 16 Cal.4th 1009, 1013-1014 (*Castillo*).) "Although a trial court has no sua sponte duty to give a 'pinpoint' instruction on the relevance of evidence of voluntary intoxication, 'when it does choose to instruct, it must do so correctly.'" (*People v. Pearson* (2012) 53 Cal.4th 306, 325, quoting *Castillo*, *supra*, 16 Cal.4th at p. 1015.) Here, the trial court gave the voluntary intoxication instruction on its own motion, without a request from appellant. Because the instruction failed to inform the jury that it could consider the evidence of intoxication not only in determining whether appellant acted with the specific intent to kill, but also in determining whether appellant killed Valladares with deliberation and premeditation, the instruction was incomplete, and the trial court erred in giving it. (*Castillo*, *supra*, 16 Cal.4th at p. 1016.)

The error, however, was harmless. Generally, the failure to give a correct instruction regarding voluntary intoxication is assessed for prejudice under the test stated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Pearson*, *supra*, 53 Cal.4th at p. 325.) Under that test, an error is reversible only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) Here, the jury was

---

[7] "'"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]"'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Nonetheless "'"[p]remeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived *(Fn. continued on next page.)*

properly instructed regarding the relevance of the intoxication evidence to appellant's intent to kill, and the jury, in finding appellant guilty of deliberate and premeditated murder, necessarily determined that he acted with that intent. The key issue, therefore, is whether there is a reasonable probability that the jury would have found that appellant carried out his intent to kill without deliberation and premeditation, had the jury been correctly instructed regarding voluntary intoxication.[8]

The record discloses no such probability. Both Diaz and Perla saw appellant repeatedly swinging a pan, and the medical examiner concluded that Valladares died of a combination of multiple blunt force injuries that fractured his skull and multiple sharp force injuries, over a dozen of which were fatal, including one that cut his carotid artery. Appellant thus did not kill Valladares by a single fatal act, but by bludgeoning him repeatedly with a pan and stabbing him repeatedly with a knife. Appellant's use of two different weapons to inflict multiple injuries that killed Valladares manifested deliberation and premeditation. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1165 [evidence that defendant stabbed murder victim with knife, and then continued stabbing victim with second knife after first knife broke, established deliberation and premeditation].) Indeed, while striking Valladares repeatedly with the pan, appellant said to Diaz, "'I'm going to kill him.'" In view of the manner in which appellant killed Valladares, there is no reasonable

---

at quickly.'" [Citation.]' [Citations.]" (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1069, quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

[8] Appellant maintains that the error is subject to a more stringent test for prejudice, arguing that it deprived him of his rights under the United States Constitution to due process, a fair jury trial, and an opportunity to present a defense. However, as our Supreme Court has explained, "the failure to give a fully inclusive instruction on voluntary intoxication" does not impair those rights. (*Pearson*, *supra*, 53 Cal.4th at p. 326, fn. 9.)

9

probability that the jury, if correctly instructed, would have determined that he intended to kill Valladares, but nonetheless acted without deliberation and premeditation due to intoxication. Accordingly, there was no reversible error.

B. *Instruction Regarding Voluntary Manslaughter Based on Imperfect Self-Defense*

Appellant contends the trial court erred in rejecting his request that the jury be instructed with CALCRIM No. 571, which sets forth the elements of voluntary manslaughter based on imperfect self-defense. That crime is a lesser included offense of murder. (*People v. Booker* (2011) 51 Cal.4th 141, 181-182 (*Booker*).) Generally, the trial court is obliged to instruct on a lesser included offense "when the evidence raises a question whether all of the elements of the charged offense were present . . . [citation]," but not "[w]hen there is no evidence the offense was committed less than that charged . . . ." (*Id.* at p. 181.) As we explain below, there is insufficient evidence to support the requested instruction.

Reasonable or "perfect" self-defense constitutes a complete exoneration from a charge of murder. (*People v. Stitely* (2005) 35 Cal.4th 514, 551 (*Stitely*).) Section 197, subdivision (1), provides that homicide is justifiable when committed by a person "'[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person . . . .'" The defense "does not depend on the existence of actual danger, but rather depends on appearances." (*People v. Clark* (1982) 130 Cal.App.3d 371, 377, fn. 1, abrogated on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) To establish the defense, the defendant need only show that he had "an honest and reasonable belief in the need to defend himself . . . ." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) In contrast, unreasonable or "imperfect" self-defense operates to reduce murder to voluntary manslaughter. (*Booker*, *supra*, 51 Cal.4th

10

at p. 182.) "'One acting in imperfect self-defense . . . actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable.'" (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

Perfect and imperfect self-defense are subject to two common principles. Neither doctrine may be invoked by a defendant "who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Furthermore, under each doctrine, the defendant's fear "'must be of imminent harm. "Fear of future harm -- no matter how great the fear and no matter how great the likelihood of the harm -- will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury."'" (*Stitely*, *supra*, 35 Cal.4th at p. 551, quoting *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

Here, the trial court declined to give the requested instruction, concluding there was no evidence that appellant actually believed in the need to defend himself against Valladares and specifically, no testimony of appellant to that effect. On appeal, we employ a de novo standard of review, and thus independently determine whether the instruction should have been given. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584 (*Manriquez*).) For the reasons discussed below, we affirm the ruling, as the trial evidence showed only that Valladares resorted to legally justified force when appellant wrongfully attacked him, and that appellant lacked fear of imminent danger from Valladares when appellant killed him.[9]

---

[9] In view of our conclusion, it is unnecessary to address respondent's contention that it was unnecessary for the trial court to give imperfect self-defense instructions *(Fn. continued on next page.)*

11

The jury was presented with two versions of the events preceding Valladares's death, neither of which supported the requested instruction. The prosecution's evidence, which relied on Diaz's testimony to establish those events, otherwise showed that appellant was considerably younger and bigger than Valladares, who was 67 years old, weighed 92 lbs., and was 5 feet tall. Appellant was 46 years younger than Valladares, outweighed him by 58 lbs. and was 5 inches taller.

Diaz testified that after threatening Perla, appellant threw objects at Valladares when he asked appellant not to hit her, and then fought with him. According to Diaz, Valladares had no weapon. When Diaz intervened, the fight briefly ended, but Diaz soon saw appellant apparently clubbing Valadares with a pan. Shortly afterward, appellant left the apartment, covered with blood and holding the knife Valadares had used to cut lemons. Because Diaz's testimony does not suggest that Valladares used unjustified force in attempting to repel appellant's wrongful attack or that appellant actually feared imminent harm from Valladares, it provides no basis for the requested instruction.

In our view, the same is true regarding the version of the pertinent events supported by Perla's testimony. According to Perla, appellant spent the evening gambling with Valladares in the kitchen. In the early morning of the following day, when appellant returned to the bedroom and demanded more gambling money from Perla, they engaged in a violent physical struggle, and she fled to the bathroom. There, Perla heard Valladares say, "'What did you do to her?,'" followed by the apparent sound of the water cooler toppling in the kitchen. Upon leaving the bathroom, she saw appellant in the kitchen struggling with Valladares, who held a knife. Valladares said, "'You didn't expect this.'" After returning to

_____

because it instructed the jury regarding perfect self-defense.

12

the bathroom, Perla again left it and saw Diaz holding appellant's face, while preparing to hit him. Valladares stood nearby, holding the knife. Following another retreat to the bathroom, Perla observed appellant atop Valladares on the kitchen floor, but did not see either of them holding the knife. After fleeing the apartment, she saw appellant looking down and repeatedly clubbing something with a pan. Appellant then left the apartment in haste, covered with blood and holding the knife.

Although Perla did not have a continuous view of the events preceding Valladares's death, nothing in her testimony supports the reasonable inference that Valladares wrongfully began the fight or used unlawful force against appellant. Generally, a person may justifiably use a potentially deadly weapon against a larger but unarmed assailant engaged in an unprovoked and felonious attack. (*People v. Collins* (1961) 189 Cal.App.2d 575, 591 [defendant justifiably killed unarmed but physically larger assailant by hitting him with wine bottle when the assailant tried to rape him].) Here, Perla's testimony shows only that after her violent fight with appellant in the bedroom, Valladares called out regarding her welfare. Appellant responded by moving quickly from the bedroom to the kitchen. In view of appellant's violence against Perla, that response could only be regarded by Valladares as an attack by a much younger and larger assailant. In the kitchen, Valladores met appellant -- apparently, to appellant's surprise -- with a knife. That Valladares never intended to use more force than reasonably necessary to repel appellant is established by the events Perla saw the second time she left the bathroom, coupled with the fact that appellant displayed only some scratches after the incident. When Perla left the bathroom the second time, Diaz was holding appellant's face, but Valladares merely stood nearby, holding the knife without trying to use it. Accordingly, Perla's testimony supports no reasonable inference that Valladares was the initial aggressor or used unjustified force.

13

Furthermore, nothing in Perla's testimony supports the reasonable inference that appellant actually feared imminent harm from Valladares while applying lethal force to him. As the trial court noted, appellant did not testify regarding his state of mind, and the circumstances surrounding Valladares's death, as described by Perla, are inconsistent with any such fear. According to Perla, the third time she left the bathroom, she saw appellant on top of Valladares. Shortly afterward, appellant appeared to club Valadares many times, and then left the apartment covered with blood and holding the knife. Perla's testimony thus shows only that appellant bludgeoned and stabbed a disarmed, elderly, and much smaller man. That evidence cannot reasonably be regarded as sufficient to show that appellant actually feared imminent harm from Valadares while killing him. (See *People v. Hardin* (2000) 85 Cal.App.4th 625, 634, fn. 7 [noting that regarding the defendant's entitlement to instructions on imperfect self-defense, after he took away the hammer his elderly and much smaller victim was using to defend herself, he "could no longer entertain the belief that she constituted an *imminent* and *deadly* peril to him"].) In sum, the trial court did not err in declining to instruct the jury regarding voluntary manslaughter based on imperfect self-defense.[10]

---

[10] Even if the trial court had been obliged to instruct the jury regarding voluntary manslaughter based on imperfect self-defense, we would find no reversible error. At appellant's request, the trial court instructed the jury regarding perfect self-defense. During closing argument, the prosecutor urged the jury to reject that defense, arguing that the evidence established that appellant initiated the fight with Valladares, that Valladares responded reasonably to appellant's attack, and that Valladares posed no danger to appellant when appellant killed him. Because the jury declined to accept appellant's theory of perfect self-defense and found him guilty of premeditated and deliberate murder, the jury would have returned the same verdict had it been instructed regarding voluntary manslaughter based on imperfect self-defense, in view of the compelling evidence that appellant did not commit that offense. Any instructional error was thus harmless. (*Manriquez*, *supra*, 37 Cal.4th at p. 581 [when the jury found defendant guilty of first degree murder and the evidence of voluntary manslaughter based on imperfect
*(Fn. continued on next page.)*

14

C. *Juror Misconduct*

Appellant contends the trial court erred in denying his motion for a mistrial based on juror misconduct and juror bias. He argues that the court erred in finding no misconduct sufficient to support a mistrial. We disagree.

1. *Governing Principles*

A mistrial should be granted only when the trial court "is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citations.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) Denial of a mistrial motion is reviewed for an abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984.)

Appellant's mistrial motion contended that during trial but before jury deliberations began, some jurors improperly discussed the case. Jurors are subject to a "duty not to . . . converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them." (§ 1122, subd. (b).) The jury was so instructed during the underlying trial. Violation of that duty by jurors "is serious misconduct." (*In re Hitchings* (1993) 6 Cal.4th 97, 118.)

Although juror misconduct raises a presumption of prejudice, the presumption "is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of

_____

self-defense was weak, failure to instruct on that lesser included offense was harmless under the standards applicable to state and federal constitutional error].)

15

prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased . . . . " (*In re Hamilton* (1999) 20 Cal.4th 273, 296.) We independently assess whether such a reasonable probability of prejudice exists, but accept the trial court's findings of fact and credibility determinations if supported by substantial evidence. (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.)

### 2. *Underlying Proceedings*

On Wednesday, February 19, 2014, prior to the selection of the jury, the trial court told the prospective jurors that the trial's length was estimated to be four or five days. On February 20, 2014, the prosecution began the presentation of its case in chief. At approximately 3:00 p.m., the court informed the jury: "I have spoken to both attorneys. The People believe that they're going to rest their case tomorrow. So we're well ahead of schedule."

At the beginning of the morning session on Friday, February 21, 2014, outside the jury's presence, defense counsel told the court that approximately ten minutes earlier her colleague Judith Greenberg observed three female jurors engage in misconduct. Greenberg stated that she overheard the jurors discussing the imminent completion of the prosecution's case in chief. According to Greenberg, the jurors said, "'Great. Now we get to go home. We'll be done.'" Apparently referring to defense counsel, one of the jurors remarked, "'Well, I don't think she has anything to say.'" Another said, "'Oh, that will be great because I have to fight the 101 all the way to Burbank.'"

On the basis of this showing, the court decided to examine Juror Nos. 9, 6, and 8, the three jurors identified by Greenberg. The following colloquy occurred between the court and Juror No. 9:

"The Court: Was there any conversation that you had while you were waiting outside about the timing of the case or when the case may be over? . . .

16

"Juror No. 9: Yeah. Jurors were kind of speculating about whether we would be done today.

"The Court: Can you tell us just basically what the conversation was about?

"Juror No. 9: It was just about when things were going to happen. You mentioned yesterday that the prosecution thought they would rest today. So we were saying -- [we] weren't sure if we would be done with all the witnesses today or if we would go on into Monday. That was basically it.

"The Court: Was there any discussion at all about the facts of the case?

"Juror No. 9: No.

"The Court: Okay. Anything other than timing in terms of when the case may be done?

"Juror No. 9: I don't believe so, no. Not that I heard."

When defense counsel asked whether anyone had asserted that defense counsel would have nothing to say, Juror No. 9 replied: "I think one of the women said that she wasn't sure you were going to call any witnesses." Juror No. 9 otherwise denied hearing any remark regarding guilt or innocence or the strength of the case. She stated that she knew that she was obliged not to discuss the case, and thus had not commented on the strength of the case.

Juror No. 6 acknowledged that she had participated in a conversation regarding the case a few minutes earlier. The following dialogue occurred:

"The Court: Can you just tell us basically what the conversation was about?

"Juror No. 6: From [sic] yesterday's conversation and listening that possibly we would be wrapping this up today at the end of the day.

"The Court: And did anybody talk at all about the facts of the case or what the case was about?

"Juror No. 6: No.

17

"The Court:  Were there any comments that were made in terms of the strength of the People's case or the strength of the defense case?

"Juror No. 6:  Slightly, yes.

"The Court:  Can you tell us about that?

"Juror No. 6:  It just -- did not seem positive that it just -- just seemed like it was going to go really quickly, and it was going to be pretty cut and dry or whatever.

"The Court:  Cut and dry in which way?

"Juror No. 6:  Just that everything was going to be presented, and it was going to just be over with in a timely manner.

"The Court:  Did anyone talk about what they thought . . . the verdict may be, guilty or not guilty?

"Juror No. 6:  No.

"The Court:  Anyone decided about the case?

"Juror No. 6:  No.  No.  No."

When defense counsel asked, "[D]id you discuss [whether] this case was cut and dry?," Juror No. 6 answered:  "Not in full detail or anything like that.  It was just a comment about how quickly and how things were going."  Juror No. 6 also maintained that she understood her duty not to discuss the case.

When the trial court first inquired regarding a potential conversation among jurors, Juror No. 8 stated:  "[W]e were talking about that we hoped that the case wasn't taking until 4:30 or that it's going to [take the] full day.  And when we should deliberate."  Juror No. 8 said that the conversation addressed whether deliberations would begin on Tuesday, as well as "traffic."  The following dialogue ensued:

"The Court:  Were there any discussions at all about the facts of the case?

"Juror No. 8:  No.

"The Court: Anybody voice any opinions as to . . . the strength of the People's case or the defense case?

"Juror No. 8: Not that I recall."

In response to defense counsel's questions, Juror No. 8 denied hearing anyone remark the case was "cut and dry," or that appellant had "nothing to say" in his defense."

Shorty afterward, Juror No. 8 stated that the conversation she had been describing occurred during the lunch break on February 20, the previous day. The trial court resumed its examination:

"The Court: Was there any conversation today . . . before we started [this] session?

"Juror No. 8: Yes. We were discussing again if we were going to have a full day because you had mentioned that it's going to take until 4:30. And we were saying[, 'I]t's Friday. I wonder if it's going to take until 4:30 or if we're going to be deliberating on Monday.' [¶] . . . [¶]

"The Court: But nothing about the facts of the case?

"Juror No. 8: No."

After examining the jurors, the trial court directed each not to discuss any aspect of the case. The court denied the mistrial motion, concluding that although the jurors had engaged in misconduct, they never discussed "the strength of the case." Following the hearing on the motion, the court admonished the entire jury not to discuss the case "or any subjects involved in it."


### 3. *Analysis*

We agree with the trial court that no misconduct occurred sufficient to establish juror bias or mandate a mistrial. When a trial court renders a factual finding regarding the existence of juror misconduct, "[t]he power to judge the

19

credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court, and its findings of fact, express or implied, must be upheld if supported by substantial evidence." (*In re Carpenter* (1995) 9 Cal.4th 634, 646.) As explained below, the record discloses substantial evidence to support the trial court's determination that no misconduct incurable by an admonition occurred, and we otherwise see no basis to reverse the court's ruling.

We find guidance on appellant's contention from *People v. Majors* (1998) 18 Cal.4th 385. There, the defendant sought a new trial on the basis of juror misconduct. (*Id*. at p. 418.) The defendant relied on testimony from a juror who stated that during trial, he overheard other jurors express opinions regarding the case. (*Id*. at pp. 422-426.) When asked whether the jurors engaged in those discussions were convinced of the defendant's guilt, the juror replied, "'I really don't recall. They just varied. Some were not sure, some were speculating.'" (*Id*. at p. 424.) The pertinent jurors themselves denied discussing the evidence. The trial court denied the new trial motion, concluding that the jurors had not focused on the evidence or outcome of the case, but merely expressed frustration with aspects of the trial "'process.'" (*Ibid*.) In affirming the denial of the new trial motion, our Supreme Court concluded there was substantial evidence to support those findings. (*Id*. at pp. 424-425.)

We reach the same conclusion here, as there is sufficient evidence to support the trial court's finding that the jurors merely discussed the trial's potential duration. Each juror expressly denied discussing the evidence and outcome of the trial. As the court noted, although Juror No. 6 referred to the case as "'cut and dry'" when she testified, she explained that she used the term only to refer to "the duration of the case." Because the record discloses "no substantial likelihood that one or more jurors were actually biased . . . ." (*In re Hamilton*, *supra*, 20 Cal.4th

20

at p. 296, italics deleted), the trial court did not err in concluding that the misconduct was curable by an admonition.

Appellant's reliance on *People v. Brown* (1976) 61 Cal.App.3d 476 and *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778 (*Grobeson*) is misplaced. In *Brown*, the defendant supported his new trial motion with a declaration from a juror stating that early in the trial, he talked to a fellow juror, who said of the defendant, "'He is guilty,'" and "'There is no doubt about it.'" (61 Cal.App.3d at pp. 478-479.) Although the declaration was uncontradicted, the trial court denied the new trial motion. (*Id.* at p. 482.) In reversing, the appellate court concluded that the declaration could not be disregarded because it clearly showed that a juror had prejudged the defendant's case. (*Id.* at pp. 480-481.) No such evidence was presented here.

In *Grobeson*, the plaintiff supported his new trial motion with a declaration stating that during the trial, a juror said, "'I made up my mind already. I'm not going to listen to the rest of the stupid argument.'" (*Grobeson*, 190 Cal.App.4th at p. 784.) The same juror submitted a declaration in which she denied making those remarks. (*Ibid.*) The appellate court affirmed trial court's grant of a new trial, concluding the record established juror bias. (*Id.* at pp. 786-796.) As explained above, the record before us does not do so. In sum, the trial court did not err in denying a mistrial predicated on juror misconduct.

### D. *Juror Identification Information*

Appellant contends the trial court improperly denied his motion for juror identifying information. We disagree.

Generally, after a jury's verdict is recorded in a criminal trial, all juror identifying information is removed from the record. (Code. Civ. Proc., § 237, subds. (a)(2), (a)(3).) In preparing for a new trial motion, defendants and their

counsel may file a petition for access to juror identifying information in order to communicate with jurors. (Code Civ. Proc., § 206, subd. (g).) Subdivision (b) of Code of Civil Procedure, section 237 provides: "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." The trial court's ruling on the petition is reviewed for an abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

Here, appellant's motion contended the out-of-court discussions by Juror Nos. 9, 6, and 8 adversely affected the trial's outcome, noting that the jury returned its verdicts after less than one hour of deliberations. Supporting the petition was a declaration from defense counsel, who described the examination of Juror Nos. 9, 6, and 8 regarding the out-of-court discussions. Defense counsel maintained that the trial court had inadequately admonished the jurors not to discuss the case. At the hearing on the motion, defense counsel further asserted that during the trial, one of the three jurors glared at her.

In ruling on the motion, the court stated that after a careful review of the transcript of the examination, it found no deficiencies in its admonitions and no evidence that the jurors had discussed anything other than the trial's potential duration. Nor had the court observed anything in the jurors' demeanor suggesting they had prejudged the case. The court thus denied the motion, concluding that appellant failed to show good cause for access to the juror identifying information. For the reasons discussed above (see pt. C., *ante*), we see no error in that determination.

### E. *Sentencing Hearing Minute Order*

Appellant contends the sentencing hearing minute order contains an error regarding the imposition of the weapon use enhancement. We agree.

In connection with count 1, which charged appellant with Valladares's murder, the information contained a single weapon use allegation, namely, that appellant used a knife in the commission of the crime (§ 12022, subd. (b)(1)). The jury, in finding appellant guilty of Valladares's murder, found that appellant used a knife and a pot. At the sentencing hearing, the court noted that the jury had found the weapons use allegation to be true as to both the knife and the pot, and suggested that only one enhancement could be "properly given" under the circumstances. Both sides agreed. The court thus imposed a single one-year weapons use enhancement on count 1. Although the abstract of judgment merely reflects the imposition of the single enhancement, the minute order from the sentencing hearing states: "The defendant is sentence[d] to 25 years to life as to count 1. The defendant receives an additional 1 year pursuant to . . . section 12022[, subdivision] (b)(1). . . . [¶] The court does not impose the other enhancement pursuant to 12022[, subdivision] (b)(1) *pursuant to . . . section 654*."

The entry in the minute order is erroneous, as the trial court made no determination under section 654. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."].) Generally, when the abstract of judgment contains such an error, it should be corrected, as the abstract of judgment ordinarily effectuates the defendant's commitment to prison. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; § 1213, subd. (a).) Because the sentencing hearing minute order may also facilitate that commitment in some circumstances (§ 1213, subds. (a), (b)), we conclude the minute order must be corrected by deleting the phrase italicized above.

F.  *Custody Credits*

Appellant contends the trial court miscalculated his presentence custody credits.  The trial court awarded him custody credits totaling 675 days.  He argues that he is entitled to credit for an additional two days of actual custody.  Respondent agrees.  We conclude that appellant's custody credits must be corrected to reflect custody credits totaling 677 days.

## DISPOSITION

The judgment is modified to reflect that appellant is entitled to custody credits totaling 677 days.  The trial court is directed to correct the sentencing minute order to reflect that modification and to eliminate the reference to section 654 described above (see pt. E., *ante*), to prepare an amended abstract of judgment accurately stating appellant's custody credits, and to forward the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


COLLINS, J.

24